IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| REINALDO LOPERENA, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 2:08-cv-99 |
| MIKE SCOTT, in his official capacity as Lee County Sheriff, a political subdivision or County Office, | ) Judge Thomas A. Wiseman, Jr. ) ) ) ) |
|     Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff Reinaldo Loperena filed this action against Mike Scott, Lee County Sheriff, in his official capacity, alleging claims of unlawful employment practices in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301 *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and the Florida Civil Rights Act ("FCRA"), Fla. Stat. Ann. § 760.01. Because suit against Sheriff Scott in his official capacity is tantamount to suit against the government entity he represents, *Kentucky v. Graham*, 473 U.S. 159 (1985), the true defendant here is Lee County Sheriff's Office, a subdivision of Lee County.

Now before the Court is the defendant's motion for summary judgment (Doc. No. 21). As set forth below, the Court finds that there are no material issues of disputed fact and that the Defendant is entitled to judgment in its favor as a matter of law. The motion will therefore be granted.

**I.    FACTUAL BACKGROUND**

The facts are basically undisputed except as otherwise indicated.

Plaintiff Reinaldo Loperena served as a New York City Policy Officer from January 1984 to November 29, 2000, after which he retired to Florida sometime in 2002. Before becoming a police officer, he had served as a corrections officer with the New York State Department of Corrections and the New York City Department of Corrections from 1977 to 1984. Before that, he had served on active duty as a U.S. Army Airborne Infantry Paratrooper from 1972 through 1974, stationed in Europe, and was

1

honorably discharged in 1974. He thereafter continued to serve as an army reservist for a total of approximately twenty-one years. In addition to being activated to assist with clearing and searching the sight of the Twin Towers attack, Loperena was recalled to active duty from May 15, 2004 through October 12, 2005, during which he spent approximately a year in Iraq. He was awarded the Army's Combat Infantryman Badge in formal recognition for having engaged the enemy in combat. Following his honorable discharge after serving in Iraq, Loperena returned home to Florida but remained subject to active duty recall through December 2006. There is no dispute that Loperena has a distinguished military record of service and proven dedication to the armed service.

After returning home from Iraq, Loperena started having nightmares. According to his testimony, these dreams still occur approximately two to three times a week. In the Spring of 2006, Loperena sought and began to receive mental health services at the Fort Myers Veterans' Administration where he was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and prescribed Paxil for related anxiety. During the time frame relevant to this lawsuit, Loperena continued to see a psychiatrist on an as-needed basis, approximately every three months. The psychiatrist was aware that Loperena was no longer taking the Paxil he had prescribed. In addition, it appears that Loperena was participating in group therapy sessions once a week with a counselor of some kind.

On November 20, 2006, Loperena approached the Lee County Sheriff's Office ("LCSO") to apply for employment as a deputy sheriff. At the time, Loperena was fifty-three years old and gainfully employed with the Twentieth Judicial Circuit of Florida, Administrative Office of the Courts, as a Court Security Representative. He had been working in that capacity since approximately August 2006 when he had decided to re-enter the work force following his return from Iraq.

The LCSO has established a uniform "Steps in Hiring" protocol for the selection and hiring of Certified Law Enforcement and Corrections Officers, ostensibly for the purpose of ensuring the uniform treatment of applicants for those positions. In accordance with this protocol, Loperena first filled out a "Prescreen Questionnaire" on November 20, 2006, based upon which the LCSO determined him to be initially qualified for the position of law enforcement officer. Loperena disclosed his military experience on his pre-screen application.

On December 1, 2006 completed a formal LCSO Employment Application Form. Under the

2

heading "Veterans' Preference," the Application Form specifically asked, among other questions: "Have you claimed and been employed using veterans' preference since October 1, 1987?" and "Are you designated as disabled because of any military service?"[1] (Doc. No. 44-5, at 35.) Loperena answered both questions in the affirmative. He was given a conditional offer of employment on December 1, 2006, which was contingent upon his completion of several additional steps including submission to a background check and a polygraph examination, among other things as discussed below.

On December 13, 2006, Loperena was administered the polygraph test. As part of that process, he filled out a pre-testing questionnaire and underwent a pre-testing interview. The questionnaire asked a number of questions pertaining to the applicant's mental health history and Loperena disclosed that he had been diagnosed with PTSD and was receiving psychiatric help for the condition. In response to the question "Have you ever been under the care of a Psychiatrist/Psychologist, treated for any stress, emotional, nervous problems or recommended to be (even if not done)?" the plaintiff responded "yes," and added "PTSD. Every couple of months. Last time 1 1/2 mos ago." (Doc. No. 47, at 27 (12/13/2006 Lee County Office of the Sheriff Pre-Employment Polygraph Test Worksheet).) The polygraph examiner's written narrative report likewise indicates that Loperena disclosed that he was "currently under a doctor's care for Post Traumatic Stress Disorder. He says he sees a psychiatrist/psychologist every couple of months for the PTSD." (Doc. No. 44-2, at 7.) Loperena also reported to the polygraph examiner that he had served one year of active military duty in Iraq, and that he was eligible for re-enlistment in the armed services.

The result of the polygraph examination showed "significant responses" to questions related to Loperena's physical and mental health, involvement in any illegal drug use, and whether he had stolen more than $25.00 worth of money or merchandise from any employer. According to Ann Marie Reno, Human Resources Manager, Loperena was rejected for employment at that point as a result of these "significant responses," because they were deemed to indicate deception. (Doc. No. 44-2 ("Reno Aff.) ¶ 3 and Ex. 3.) Reno sent a letter to Loperena dated January 8, 2007 notifying him that he had not been

---

[1] The term "Veterans' Preference" refers to an array of state and federal statutory and regulatory provisions pursuant to which honorably discharged veterans may be granted preference in appointment to public employment. Under Florida law, the state and all political subdivisions of the state "shall give preference in appointment and retention in positions of employment to . . . disabled veterans[.]" Fla. Stat. § 295.07(1)(a).

3

selected for the position of law enforcement officer.[2]

Loperena contacted Reno regarding his rejection and requested to retake the polygraph test. Reno and Human Resources Director Dawn Heikkila (formerly Bennett) met with him to discuss the matter and, based on his prior law-enforcement experience, agreed to re-administer the polygraph test to cover the three areas of concern. The second polygraph test was administered on March 12, 2007 and indicated no "significant responses." As a result, Loperena was permitted to move forward in the process of qualifying for employment with the LCSO.

Meanwhile, the background investigation on Loperena was completely clean, and the LCSO Investigator who performed the background check filed a Report dated March 16, 2007 in which he opined that the plaintiff was "more than qualified for the position for which he has applied"; he also noted that Loperena's current supervisor with the Administration of Courts "highly recommend[ed] him." (Doc. No. 47, at 35.) Based on the applicant's extensive experience and the fact that the investigation did not reinforce in any way the initial polygraph examination issues, the examiner recommended that Loperena be hired. (*Id.* at 36.)

The next stage in the hiring protocol was an Oral Board Interview, which also took place March 21, 2007, with Major Dale Homan, who presided over the interview, and two Captains in the LCSO. According to Loperena, the first thing Major Homan asked when Loperena arrived for the interview was, "How is your PTSD?" In response, Loperena described his "cold sweats" and disclosed the fact that he had recurrent nightmares, but also stated truthfully that the condition was under control. (Loperena Aff. ¶ 17.) Despite these disclosures, according to Loperena, "it is clear that all members of the board assigned Mr. Loperena a passing score," and, at the conclusion of the interview, Major Homan verbally told Loperena that he would be hired and that the LCSO would pay for him to attend an "Equivalency of Training" course that was required for law enforcement officers in Florida who, like Loperena, had undergone training and been certified in other states. On the same day, Major Homan sent a memo to the Human Resources department indicating the LCSO would sponsor Loperena for a complete scholarship at the Equivalency of Training required for law enforcement officers who had been certified in

---

[2] Loperena points out that the initial decision not to hire him solely as a result of the first polygraph test was in contravention of LCSO's own policies. Because he was allowed to take a second test and continue through the qualifying process, this initial protocol discrepancy does not appear to have any relevance to Loperena's claims.

other states.

LCSO sent Loperena a letter dated March 21, 2007 informing him that the LCSO was again extending to him a contingent offer of employment. The offer was contingent upon his successfully completing the remaining steps in the hiring protocol, including physical and psychological examinations, audiogram and drug screen test. (Doc. No. 47, at 74.)

In connection with these steps, Loperena executed a medical release to enable the LCSO to obtain his medical records. During the medical examination, he disclosed that he suffered from PTSD-related depression, was currently taking Paxil and was "being seen by VA psychiatrist every 2–3 months." (Doc. No. 47, at 50 (LCSO Medical Assessment Form).). The medical questionnaire also indicates that Loperena had seen a "VA MD" in 2006, though he does not indicate why, that he received VA disability benefits, and that he had been exposed to loud gunfire and explosions in Iraq. (Loperena Aff. ¶ 18 and Ex. 11 (Doc. No. 47, at 51).)

Loperena then submitted to psychological testing and an oral interview with psychologist Barbara Palomino de Velasco ("Palomino") in April 2007. Palomino is not an employee of the LCSO; she is an independent psychologist who performs services for a number of agencies. Her letterhead indicates the name of her company is Palomino de Velasco, Inc.

In filling out the background questionnaire provided by Palomino, Loperena answered "yes" to questions pertaining to whether he had ever received assistance from mental health professionals and whether he was prescribed medication for anxiety. (Loperena Aff. ¶ 19 and Ex. 12 (Doc. No. 47, at 54–56).) Specifically, under the section entitled "Psychological Treatment," in response to the question of whether he had "ever received assistance from a mental health professional, *e.g.* psychologist, psychiatrist, social worker, marriage/family therapist, etc. for an emotional or personal concern," Loperena answered: "Psychologist." (Doc. No. 47, at 55.) He further indicated he had been prescribed medication for anxiety. (Doc. No. 47, at 56.) Loperena insists that during the oral interview with Palomino he also "elaborated and specifically told her everything about [his] history and treatment including the fact that [he] had access to, and voluntarily availed [him]self of, weekly group therapy sessions at the VA with other veterans." (Loperena Aff. ¶ 19.) Palomino's hand-written notes from that interview, however, indicate that he told her he was seeing a psychiatrist approximately every three months "PRN," or as

needed, but that he had done "no marital counseling or any other m[ental] h[ealth] hx [history]." (Doc. No. 47, at 60.)

Following the evaluation and interview, Palomino prepared an evaluation report regarding Loperena for use by the LCSO in evaluating Loperena for employment. She submitted the report to Human Resources Director Dawn Heikkila. The report placed Loperena in the "marginal" "risk/suitability classification" (Doc. No. 47, at 65), which did not disqualify him from the job he sought nor derail the hiring process.[3] According to the LCSO, other prospective employees have been hired following similar "marginal" classifications by Palomino. In other words, at that point, Loperena was deemed psychologically fit for employment with the LCSO.[4]

On April 30, the LCSO processed an "Action Sheet Request Form" indicating that Loperena had been "[h]ired as a L/E Trainee to attend the EOT [Equivalency of Training]." (Doc. No. 47, at 82.) Because his appointment was basically confirmed at that point and he had successfully completed every step of the LCSO hiring process, Loperena resigned his position as Court Security Officer effective the day before he was supposed to start the EOT course.

On May 2, 2007, however, Loperena had an appointment to meet with Human Resources assistant Dian Bowman at the Headquarters of the LCSO in order to complete the final processing of new-employee paperwork. At that meeting, Loperena filled out all of the paperwork required of a new hire, including an IRS Form W-4. The process took place in Bowman's office with no other persons present. According to Loperena, the meeting with Bowman was uneventful and their conversation was unremarkable. Regarding that conversation, Loperena testified in his affidavit as follows:

> I may have had some questions about the forms and I cordially answered every question she posed. The process when smoothly and was not remarkable in any way. As I left

---

[3] Palomino based the "marginal" rather than "acceptable" classification upon her findings that Loperena had "moderate to significant deficit" in the areas of "openness" and "stress tolerance/emotional composure." (Doc. No. 47, at 66.)

[4] In support of an inference that Palomino was not truly independent and that there was already something fishy going on between her and LCSO's Human Resources office at that point, Loperena points to a somewhat ambiguous e-mail from Palomino to Dawn Bennett Heikkila. The e-mail, dated April 28, 2007, states in pertinent part: "Thank you, just protecting all of us. So you want me to pursue with Reinaldo Leprena [sic] for LEO (Bailiff)?" (Doc. No. 47, at 80.) According to Palomino's deposition testimony, the first sentence quoted had nothing to do with Loperena. In the second, she was confirming that Loperena was seeking employment as a bailiff rather than as a patrol officer, which she needed to clarify for purposes of finalizing her initial report. (Palomino Dep. at 131:16–133:18 (Doc. No. 44-7, at 18–20).)

> her office, [Bowman] thoughtfully reminded me to come back the following day to pick up a check relating to the E.O.T. training. She never seemed the least bit uncomfortable with me.

(Loperena Aff. ¶ 23.)

After he had completed all the required paperwork, Loperena also had his picture taken for an identification card. While he was outside Bowman's office waiting to have his picture taken, he was approached by Palomino who, according to Loperena, "said something about how she knew of certain mental health counselors with prior law enforcement experience that she could refer [him] to if [he] wanted." (Loperena Aff. ¶ 24.) Loperena thanked her but told her he was happy with the services he was receiving at the VA. Loperena professes to have been surprised to have been thus approached by Palomino, "since [he] had not requested to see her, nor did [he] ever indicated that [he] felt a need for any addition mental health services or complain about the services [he] received at the VA of which she was abundantly aware." (Loperena Aff. ¶ 24.) Palomino nonetheless wrote down her own name and telephone number on a piece of paper and gave it to him.

Later that day, Loperena received a call from H.R. Manager Ann Marie Reno, who asked him to return to the LCSO that very afternoon to meet again with Palomino. He did so. According to Loperena, as soon as he entered Palomino's office, she "angrily" began questioning him, asking, "Who do you think you are discussing your personal information with a complete stranger?" Further, according to Loperena, Palomino acted surprised at hearing that he received mental health services at the VA. Loperena claims this was "strange" to him because he had allegedly been very open about his condition at every stage of the hiring process. Palomino nonetheless indicated that she would have to re-consider her prior psychological evaluation and that he would be hearing from the HR department of the LCSO.

Thereafter, Palomino changed her original report by marking Loperena's "Risk/Suitability Classification" as "Unacceptable," and by indicating a "Significant Deficit" in the area of openness. (Doc. No. 47, at 88, 89.) Unlike in her original report, she did not indicate any deficit under the category of Stress Tolerance / Emotional Composure. Otherwise, she apparently did not change the report in any other respect.

Palomino's version of events leading up to the second meeting with Loperena and her reclassification of him as "unacceptable," is quite different from Loperena's. According to Palomino, on

the morning of May 2, 2007, Dian Bowman, who had met with Loperena earlier the same day, came across Palomino and questioned her regarding Loperena's well being. According to Palomino, Bowman reported that, while she was processing his final paperwork that morning, Loperena disclosed to her "very personal information relating to his witnessing the death of friends in the military, his divorce, his seeing a psychiatrist but refusal to take his medication." (Doc. No. 47, at 94.) This is the same conversation Loperena himself describes as having been entirely innocuous.[5] In any event, Palomino reported this conversation to Human Resources Manager Ann Marie Reno, who in turn mentioned it to Major Homan. Because of "concern about [Loperena's] well-being," Homan requested that Palomino meet again with Loperena to question him regarding why he would report unusual and private information to a clerk.

Palomino returned to the LCSO to meet with Loperena again on the afternoon of May 2, 2002. At that meeting, according to Palomino, Loperena first reported that he had been seeing a therapist on a weekly basis since his return from Iraq in 2005. According to Palomino, when she first interviewed Loperena in April 2007, Loperena, when questioned whether he had in the past or was presently receiving any mental health treatment or services (other than seeing a psychiatrist once every two to three months), he specifically denied receiving any such services. (Doc. No. 47, at 93.) At the May 2 meeting, Palomino asked him why he had not previously disclosed the information that he was seeing a therapist on a weekly basis despite having been given ample opportunities to do so. According to Palomino, Loperena reported that he felt he had provided sufficient information when he disclosed that he was seeing a psychiatrist. Palomino further states that, as a result of Loperena's failure previously to disclose his participation in weekly counseling sessions for some period of time, she changed his evaluation rating to "unacceptable"

> solely due to his omissions of important mental health information. One of the most important essential job traits (rated as critical) in law enforcement is truthfulness. The information provided by [Loperena] after the fact suggests misrepresentations of information and deceitfulness, which calls into question the veracity of the entirety of his previous self-disclosure.

(Doc. No. 47, at 94.) In her deposition, Palomino specifically testified that it was solely her decision to

---

[5] When questioned about the incident at her deposition in November 2008, Bowman did not remember any details about her conversation with Palomino; she only remembered that she had initiated the conversation with Palomino about her conversation with Loperena and that whatever she disclosed prompted Palomino to inquire further as to what Loperena had said to Bowman. (See Doc. No. 44-6, at 21, Bowman Dep. at 40:2–5.) Bowman also recalled that Loperena had "told [her] stuff" about his divorce and his war experience. (Bowman Dep. at 32:21–33:9.)

8

change the psychological rating she had previously given Loperena, based on the "unusual circumstance" presented. (Doc. No. 44-7, at 15, Palomino Dep. at 128:2–8.)

In a note to the file by Ann Marie Reno dated May 2, 2007, Reno stated:

> The doctor is pulling back the marginal report and going to make him [Loperena] unacceptable to protect our agency. She is concerned that with his depression he might hurt himself . . . . [S]he is concerned about him having a gun. The other thing that now concerns her if we reject him than [sic] he may become even more depressed.

(Doc. No. 47, at 96.)

After Palomino informed her that she was rescinding her initial report and changing her evaluation of Loperena to Unacceptable, Reno informed Homan of that fact. As a result of Palomino's reclassification, Homan instructed Reno to inform Loperena that he was being rejected for employment. Reno contacted Loperena by telephone on May 3, 2007 to inform him that his employment offer had been retracted. (See also Doc. No. 44-2, Reno Aff.)

The LCSO has never before required a second post-offer psychological evaluation or report of an applicant following an initial non-disqualifying psychological evaluation and report.

According to Dawn Heikkila, LCSO Human Resources Director, the LCSO "routinely hires applications with military experience who are qualified for employment." (Doc. No. 44-3 (Affidavit of D. Heikkila), at ¶ 1.) Also according to Heikkila, Major Homan's decision to reject Loperena for employment based upon his "unacceptable" rating by Dr. Palomino is "consistent with previous decisions involving other applicants with similar ratings." (*Id.* ¶ 6.) Attached to Heikkila's affidavit as exhibits are copies of letters to two other applicants for employment by the LCSO notifying them that they had not been selected for employment as law enforcement officers. (Doc. No. 44-3, at 15, 16.) Heikkila attests that these two persons were rejected because of "unacceptable" ratings by Palomino, and that she personally approved the rejection letters and the decision not to hire the individuals in question as a result of their unacceptable psychological evaluations. (Heikkila Aff. ¶ 6.)

In his affidavit, Dale Homan, LCSO Administration Bureau Commander since January 1, 2005, states that he has supervisory responsibility for the Human Resources Division of the LCSO, including the employment application process. According to Homan, Palomino's initial classification of Loperena as "marginal" did not disqualify the plaintiff from employment. Her re-evaluation, however, rating him as "unacceptable," rendered Loperena unsuitable for employment as a sheriff's deputy and, as a result of

9

that rating, Homan directed Ann Marie Reno to reject him for employment. (Doc. No. 44-4 (Affidavit of D. Homan) at ¶¶ 1–3.) Homan further attests that, prior to becoming Administration Bureau Commander in 2005 he was Director of Human Resources, but that during the entire time that he has been a decision maker for the LCSO relating to the hiring of new employees, he is "unaware of any applicant who received a psychological evaluation of unacceptable and was employed by this agency." (*Id.* ¶ 4.)

## II.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); s*ee also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)). A factual dispute is " 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, "[a] mere scintilla of evidence supporting the [nonmoving] party's

position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## III.   LEGAL ANALYSIS

### A.   Plaintiff's Claim of Disability Discrimination under the ADA[6]

Loperena alleges that the LCSO discriminated against him on the basis of an actual or perceived disability, in violation of the ADA, when it denied him employment. In its motion for summary judgment, the LCSO argues that there is no direct evidence of disability discrimination in the record; that Loperena cannot establish a *prima facie* case of discrimination with circumstantial evidence; and that, even if he could establish a *prima facie* case, he cannot rebut the LCSO's proffered legitimate, non-discriminatory reason for retracting Loperena's offer of employment. In response, Loperena contends that there is direct evidence of disability discrimination in the record and, alternatively, that there is at least a disputed issue of fact as to each element of his *prima facie* case. Finally, he contends basically that there are holes and inconsistencies in the defendant's evidence regarding its proffered, non-discriminatory reason for withdrawing the employment offer.

Before addressing the parties' arguments, the Court notes that the ADA was recently amended to substantially change the evaluation of ADA claims and the definition of "disability" under the ADA. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). The ADA Amendments Act expressly provides that its provisions shall not take effect until January 1, 2009. When a case implicates a federal statute enacted and given effect after the events in suit, that statute will not be construed to have retroactive effect absent clear congressional intent. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994) (declining to apply 1991 amendments to Title VII retroactively, noting: "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date."). Consequently, given the 2008 Act's express effective date, virtually every court to consider the issue has determined that there is no clear congressional intent to have it apply retroactively, and has therefore declined to apply the Amendments retroactively to conduct that predated the effective date of the Act. This Court concurs and will apply the law as it stood at the

---

[6] Neither party actually addresses Loperena's claims under the Florida Civil Rights Act ("FCRA"), Fla. Stat. Ann. § 760.01, but resolution of his claims under the ADA will be dispositive of his state-law claims, as Florida courts apply the ADA framework for FCRA claims. *St. Johns County Sch. Dist. v. O'Brien*, 973 So. 2d 535, 540 (Fla. 5th Dist. Ct. App. 2007).

time of the events giving rise to the complaint in this case, before the Amendments took effect. *Accord EEOC v. Agro Distr. LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009); *Kiesewetter v. Caterpillar, Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008).

As federal courts have repeatedly recognized, the general purpose of the ADA is to eradicate discrimination against persons with disabilities and to ensure equal treatment. *See* 29 C.F.R. § 1630.1(a) (1999). In the employment context, the ADA was created to provide "qualified" employees protection from discrimination based on their known or perceived disabilities. *See* 42 U.S.C. § 12112(a) (1991). The Eleventh Circuit has explained that the ADA's sole and express purpose is to provide equal, not preferential, opportunities to disabled persons. *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998).

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). In every ADA employment discrimination case, the plaintiff must demonstrate the defendant's discriminatory motive. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (noting in the Title VII context that "[p]roof of discriminatory motive is critical, though it can in some situations be inferred from the mere fact of differences in treatment"). When establishing the proscribed motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a case of intentional discrimination in violation of the ADA, a plaintiff may rely on direct or circumstantial evidence, and the type of evidence before the Court dramatically affects the allocation of evidentiary burdens. First, if direct evidence of discrimination exists, the familiar framework for establishing a *prima facie* case based on circumstantial evidence and the alternating burdens of production and proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), do not apply. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The Eleventh Circuit has explained the difference between cases involving direct evidence and cases involving circumstantial evidence:

> The *McDonnell Douglas* analysis is intended progressively to sharpen inquiry into the elusive factual question of intentional discrimination, where the plaintiff's case is made out with circumstantial evidence supporting the inference of discrimination. Where a case of discrimination is made out by direct evidence, reliance on the four-part test developed for circumstantial evidence is obviously unnecessary.

12

> Moreover, where a case for discrimination is proved by direct evidence it is incorrect to rely on a *McDonnell Douglas* form of rebuttal. Under the *McDonnell Douglas* test plaintiff establishes a *prima facie* case when the trier of fact believes the four circumstances outlined [in *McDonnell Douglas*] which give rise to an inference of discrimination. Where the evidence for a *prima facie* case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required. Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons. Once an unconstitutional motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor.

*Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773–74 (11th Cir. 1982) (footnotes, alteration, quotation marks, and citations omitted). Thus, a finding that direct evidence of discrimination exists, standing alone, is normally sufficient to defeat a motion for summary judgment. *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (per curiam). Accordingly, the Court must make a threshold determination as to whether the evidence produced by Loperena is direct or circumstantial.

### *(1) Plaintiff Lacks Direct Evidence of Discrimination.*

"Direct evidence" of disability-based discrimination is "evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. . . . Evidence that only suggests discrimination, . . . or that is subject to more than one interpretation, . . . does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations omitted); *cf. Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005) (likewise explaining that direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without interference of presumption"). Thus, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Loperena asserts that he has direct evidence of disability discrimination based upon the fact that the LCSO asked him about his disability status in his job application and required him to submit to medical and psychological examinations. (*See* Doc. No. 52, at 16, 17 (stating that it is "an act of discrimination for an employer to even ask disability-related questions prior to the extension of an offer of employment" or to require a prospective employee to submit to a medical or psychological examination, citing 42 U.S.C. § 12112(d)(4)(A)).)

The Court disagrees. First, the fact that there was a question on LCSO's employment application

asking whether the applicant was "designated as disabled because of any military service" does not constitute direct evidence of discrimination given that, in this case, Loperena's affirmative answer to that question did not appear to affect his eligibility for employment or to affect the hiring process.[7] Loperena is not stating a cause of action for damages based upon that question. Instead, he asserts that the mere appearance of the question on the employment application constitutes direct evidence of discrimination in his case. The Court finds that the question, at most, gives rise to an inference of discrimination but does not constitute direct evidence of discrimination.[8]

Likewise devoid of merit is Loperena's contention that the administration of the second psychological examination constitutes direct evidence of disability discrimination because Loperena had already been "hired" and therefore was already an employee at the time that examination was administered. (*See* Doc. No. 52, at 17 ("It is discrimination under the ADA for an employer to require an *employe[e]* to submit to medical examinations." (Doc. No. 52, at 17 (citing 42 U.S.C. § 12112(d)(4)(A)).) Loperena, however, was not already an employee at that time, despite having accepted the offer of employment, filled out a W-4, and been issued an identification card, because he had not yet begun to perform any employment duties. *See* 29 C.F.R. § 1630.14(b)(3) ("A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and *before the applicant begins his or her employment duties*[.]" (emphasis added)).

Finally, Loperena argues that the evidence in the record "clear[ly]" demonstrates that LCSO "sought the second psychological evaluation as a result of their stated belief that Mr. Loperena was disturbed." (Doc. No. 52, at 17.) The Court understands Loperena to be arguing that the fact that he was required to undergo a second psychological examination alone constitutes direct evidence of discrimination. However, neither the exam itself nor any statements associated therewith constitute direct evidence of discrimination; rather, Loperena asks the Court to an infer a discriminatory motive on the

---

[7] Moreover, as indicated in footnote 1, above, Florida state agencies are generally required by statute to engage in the preferential hiring of disabled military veterans. Fla. Stat. § 295.07(1)(a). In order to comply with the statute, the agencies obviously must be apprised of whether the applicant is eligible for preferential consideration.

[8] There is no guidance within the Eleventh Circuit as to whether a claimant who is not disabled can bring a claim for violation of the ADA based upon violation of 42 U.S.C. § 1211(d)(3). The Court assumes without deciding that the question at issue did in fact violate the ADA. However, as previously indicated, Loperena did not bring suit based upon that question and has not alleged that he suffered any damages arising from the asking of that question.

basis of the statements and the action.[9]

In sum, Loperena has not pointed to any direct evidence of discrimination in the record. The Court will therefore consider the circumstantial evidence offered in support of his ADA claim.

### *(2)* Plaintiff Fails to Establish a *Prima* Facie *Case of ADA Discrimination.*

In order to establish a *prima facie* case of employment discrimination under the ADA with indirect evidence, a plaintiff must show that: (1) he has a disability; (2) he is a qualified individual with or without reasonable accommodation; and (3) he was unlawfully discriminated against because of his disability. *Rossbach v. City of Miami*, 371 F.3d 1354, 1356–57 (11th Cir. 2004). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In the present case, Loperena argues that he is both disabled under this definition and "regarded as" having a disability. LCSO asserts that it is entitled to summary judgment of the ADA claim on the grounds that Loperena cannot establish either that he is disabled or was regarded as disabled by LCSO.

#### *(a)* Loperena Has Not Established That He Is Disabled for ADA Purposes under Pre-Amendment Law.

Loperena argues that he is disabled based upon the unrebutted evidence that he "suffers [from] PTSD which affects major life functions in that it creates depression, alters sleep habits, causes him to have nightmares and, when left untreated, causes him to feel uncomfortable around people and to in fact avoid them." (Doc. No. 52, at 17.)

Based on Supreme Court jurisprudence, a determination of whether a claimant has a disability requires a three-step analysis. *Bragdon v. Abbott*, 524 U.S. 624 (1998); *see also Rossbach*, 371 F.3d at 1357 (citing *Bragdon*). First, the Court must consider whether the plaintiff has a mental or physical impairment. *Rossbach*, 371 F.3d at 1357. If so, the next question is whether that impairment limits a life activity that is classified as a major life activity under the ADA. *Id.* Finally, the plaintiff must show that the major life activity is *substantially* limited by the impairment. *Id.*

---

[9] Loperena further argues in his Memorandum that the defendant's evidence regarding why it retracted Loperena's employment offer "strongly suggests that the LCSO's" given reason was pretextual. (See Doc. No. 52, at 16.) The use of the term "strongly suggests" to describe the evidence indicates that the evidence is by definition circumstantial rather than direct.

Turning to the facts before this Court, it is undisputed that Loperena suffers from Post-Traumatic Stress Disorder, and the Court accepts for purposes of this motion that PTSD qualifies as a mental impairment for purposes of the ADA. *Cf.* 29 C.F.R. § 1630.2(h) (defining "mental impairment" for EEOC purposes as including "[a]ny mental or psychological disorder, such as . . . emotional or mental illness"). Notwithstanding, it does not appear that PTSD, in Loperena's case, substantially limits any major life activity.

The Eleventh Circuit has noted, in the ADA context, that the EEOC regulations define the term "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Wofsy v. Palmshores Retirement Cmty*, 284 Fed. Appx. 631, 633 (11th Cir. July 16, 2008) (quoting 29 C.F.R. § 1630.2(i)). The same regulations define the term "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to an average person in the general population. *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)). In addition, the Supreme Court has stated in the ADA context that the term "major life activities" refers to those activities that are of central importance to most people's daily lives. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197–99 (2002) (explaining that these terms should be strictly construed so as to create "a demanding standard for qualifying as disabled").

Loperena testified in his deposition that the only symptoms he suffers as a result of PTSD are occasional dreams, nightmares and night sweats and "a little bit of angriness" and that he suffers these symptoms "every couple of days." (Loperena Dep. at 15:5–11 (Doc. No. 44-5, at 6).) After having nightmares, he tends to sleep later than usual the next morning but, according to his own testimony, his daily routine was not significantly impaired as a result of any of these symptoms: He cared for himself and his son; prepared meals; drove; worked out at the gym; shopped as necessary; and took care of chores around the house. (Loperena Dep. at 15–18 (Doc. No. 44-5, at 6–9.) He also testified that the symptoms he experienced had no impact on his ability to seek or hold employment. (Loperena Dep. at 27:5–9 (Doc. No. 44-5, at 11.) His PTSD also did not affect his employment in any manner when he was employed by the Twentieth Judicial Circuit of Florida as a Court Security Representative. (Loperena Dep.

at 30:14–23 (Doc. No. 44-5, at 12)).) In other words, though it appears that Loperena's impairment might to some degree affect his ability to sleep or interact with others, there is absolutely no evidence in the record that any major life activity was *substantially* limited by his impairment. Loperena has not established a disputed issue of fact as to whether he is actually disabled under the ADA.

*(b)  Loperena Has Not Shown that LCSO Regarded Him As Disabled.*

An individual who "[h]as a physical or mental impairment that does not substantially limit major life activities but is treated by [an employer] as constituting such limitation" is considered disabled under the ADA. 29 C.F.R. § 1630.2(l); *Rossbach*, 371 F.3d at 1359. For a plaintiff to prevail under this theory, he must show both that: (1) the perceived disability involves a major life activity; and (2) the perceived disability is "substantially limiting" and significant. *Rossbach*, 371 F.3d at 1360 (citing *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999)).[10]

Although there is no dispute here that Loperena disclosed his PTSD diagnosis upon applying for employment at LCSO, and that he identified his PTSD as an impairment, there is no evidence in the record that the LCSO regarded this impairment as involving a major life activity or as substantially limiting, that is, that it precluded him from performing a class or broad range of jobs, or even that it precluded him from employment at LCSO. *See Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999) ("To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); *Rossbach*, 371 F.3d at 1361 (citing *Sutton*, holding that "police officer" is not a "class of jobs" or "broad range of jobs" for ADA purposes). In fact, it is clear that Loperena disclosed his PTSD at every stage of the application process yet continually progressed in that process up until Dr. Palomino rated him as psychologically "unacceptable" just days before he was to start work. Loperena concedes that when Major Homan, the decisionmaker who was responsible for the withdrawal of his employment offer, interviewed him in March 2007, he asked but did not appear particularly concerned about the plaintiff's PTSD. At the conclusion of the interview, Homan confirmed that Loperena would be hired and, further, that the LCSO would sponsor him to attend equivalency training. Palomino knew about his PTSD but initially classified him as "acceptable" for

---

[10] To be clear, the Court recognizes that these cases have been superseded by the ADA Amendments Act of 2008 and are applicable here only because the acts giving rise to the plaintiff's claims occurred before the effective date of the Amendments.

employment at LCSO.  At no point did any person at LCSO indicate concern about Loperena's PTSD diagnosis.

Even if, as Loperena argues, the true reason behind Palomino's decision to change his rating to "unacceptable" was that she was "concerned about him having a gun" (Doc. No. 53, at ¶ 28 (citing Doc. No. 47, Ex. 21)—in other words, she was afraid he might be a danger to himself or others—that fact suggests at most that Palomino and Major Homan came to regard Loperena as unsuited to be a police officer as a result of the depression he suffered in connection with PTSD.  It does not indicate that they regarded him as substantially limited in his ability to work other jobs.  Loperena has not presented sufficient evidence from which a reasonable jury could conclude that LCSO "regarded" him as disabled. On that basis, LCSO is entitled to summary judgment of Loperena's ADA claim.

B. **Plaintiff's Claim of Discrimination under the USERRA Is Also without Merit.**

Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military.  See *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301 (2002)).  The USERRA specifically prohibits employers from discriminating or taking any adverse employment action against employees or applicants for employment on the basis of military service.  *Id.* (citing 38 U.S.C. § 4311).  The Eleventh Circuit has held that a claim of discrimination in violation of the USERRA requires proof of a discriminatory motive.  *Id.* at 1238 (citing *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)).  The standard of proof is the so-called "but for" test.  *Id.* (citing *Sheehan*, 240 F.3d at 1013).

Under the "but for" test, a plaintiff seeking to avoid summary judgment of his USERRA claim must present evidence that his protected status was a motivating factor in LCSO's decision not to hire him.  *Id.* A motivating factor does not mean that it had to be the sole cause of the employment action.  Instead, "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.' "  *Id.* (quoting *Brandsasse v. City of Suffolk* 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)).  "[M]embership in the military is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration."  *Smith v. Polk County Sch. Bd.*, 205 F. Supp. 2d 1308, 1314–15 (M.D. Fla. 2002) (internal quotation marks and citations omitted).  Circumstantial evidence plays a critical part in

these cases, "for discrimination is seldom open or notorious." *Sheehan*, 240 F.3d at 1014. Courts may infer discriminatory motivation under the USERRA from a variety of considerations, including:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.* If the plaintiff meets this burden, the employer must then prove, as an affirmative defense, that legitimate reasons, standing alone, would have induced the employer to take the same adverse action. *Id.* This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.*

In the present case, Loperena has failed to present any direct or circumstantial evidence suggesting that LCSO "relied on, took into account, considered, or conditioned its decision" not to hire him on the basis of his past military service. The sole circumstantial factor he has established is a relatively close proximity in time between the events giving rise to this lawsuit and Loperena's military service, since he returned from Iraq in 2005 and his reserve status ended in December 2006, about the time he was applying for work with the LCSO. However, LCSO clearly knew about Loperena's military service when it extended the conditional offer of employment, and knew about it when it later approved him for hire and offered him a scholarship for the equivalency training program. There is no evidence that any person affiliated with LCSO expressed hostility toward service members, and LCSO has offered unrebutted testimony that LCSO regularly hires applicants with military experience. Loperena has not offered evidence of disparate treatment of military servicemen. Basically the only proof that Loperena can offer in support of his USERRA claim is that the LCSO knew about his military experience and ultimately rejected him for the job he sought. This evidence, without more, is not sufficient to create an inference of discrimination in violation of the USERRA.

The defendant is entitled to summary judgment in its favor as to the plaintiff's USERRA claim.

**IV. CONCLUSION**

For the reasons set forth herein, the Court finds that the Defendant is entitled to summary judgment of all claims against it. The motion will therefore be granted and judgment entered in favor of the Defendant. An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge
Sitting by Designation in the
Middle District of Florida